# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

LISA MURRAY, individually, and on )
behalf of her minor children, )
MICHAEL MORROW and TINISHA )
MORROW, )
)
      **Plaintiffs,** )
)
v. )      **No. 3:06-0570**
)      **Judge Echols**
THE METROPOLITAN )
GOVERNMENT OF NASHVILLE, )
DAVIDSON COUNTY, OFFICER )
JASON HUNTER, and UNKNOWN )
OFFICERS, )
      **Defendants.** )

## MEMORANDUM

Pending before the Court is the Motion for Summary Judgment filed by the Defendant Metropolitan Government of Nashville and Davidson County ("Metropolitan Government") (Docket Entry No. 14). Also pending is the Motion for Summary Judgment filed by the Defendant Jason Hunter ("Officer Hunter") (Docket Entry No. 18). Both motions have been fully briefed by the parties.

## I. FACTS

The facts relevant to the Motions for Summary Judgment are undisputed by the parties.[1] They are as follows.

---

[1]The Metropolitan Government has filed a "Statement of Undisputed Material Facts" (Docket Entry No. 16), consisting of 27 numbered paragraphs. With respect to 26 of those facts, Plaintiffs have indicated that they are "admitted for the purposes of the Motion for Summary Judgment" (Docket Entry No. 22). However with respect to the factual allegations contained in paragraph number 24, Plaintiffs provide no response which, under Local Rule 56.01(g), means that it is not disputed. Accordingly, the Court's recitation of the facts is based upon the Statement of Undisputed Material Facts filed by the Metropolitan Government.

On April 28, 2005 at 4:59 p.m., the Metropolitan Government's Emergency Communications Center received a 911 call from Collice Goldthreate ("Goldthreate") reporting a "person with a weapon." Goldthreate gave an address of 309 Claymille Place and reported that a 16 or 17 year old male black named Michael was pointing a gun at his sister two houses away. Michael was identified as wearing a white sweatshirt over a gray top and black pants.

Officers Jason Hunter and Joel Rowney of the Metropolitan Police Department responded to the call and went to 309 Claymille Place in separate cars. Upon arrival, Officer Hunter spoke with Goldthreate. Goldthreate told Officer Hunter that she saw Michael Morrow ("Michael") point a gun at his sister in the front yard of 304 Claymille Place. Goldthreate's daughter, Remi Goldthreate, confirmed that she too saw what appeared to be a pistol.

Both officers went to 304 Claymille Place. As the officers approached the house, they drew their guns. Officer Rowney went down the driveway on the left side of the house and approached the backyard, and he saw a young man who matched the description of the armed suspect come out of the back door of the house onto the elevated wooden deck to take out the trash.

Officer Rowney pointed his pistol at Michael and said, "Freeze. Drop the bag and put your hands up." (Def. SOF ¶ 5). Officer Rowney then instructed Michael to move towards the deck steps and come down the steps slowly. When Michael reached the bottom of the steps, Officer Rowney ordered him to get on the ground and put his hands over his head. Michael complied with the order.

According to Michael, Officer Hunter then approached him and "put his foot on my back and cocked the shotgun and kind of swung it over my head [.]" (Def. SOF ¶ 6).[2] Officer Hunter never touched the shotgun to any part of Michael's body.

_____

[2]Though the agreed-to statement of facts indicates that both officers had their guns drawn, apparently Officer Hunter was carrying a shotgun.

2

While Michael was on the ground, Officer Rowney asked him "where the gun was." Michael told Officer Rowney that he and his siblings had only been playing with water guns and toy guns. The officers then let Michael get up off the ground on his own.

While the events were unfolding outside, one of Michael's sisters, Tanisha Murrow,[3] was in the house, looking out a window. Seeing Michael on the ground, she went out the back door onto the back deck. According to Tanisha, after she exited the house onto the elevated deck, Officer Rowney, who was standing on the driveway, pointed his gun up at her and told her to go back inside the house. Tanisha admits that the gun never touched her. Tanisha then went inside and called her mother, plaintiff Lisa Murray, and told her that the police were outside with Michael.

The officers then walked with Michael back up the driveway along the side of the house and around to the front porch. Officer Hunter asked Michael where the toy gun was located, and Michael told him it was in his pocket. According to Michael, Officer Hunter "was talking to me calm, eye to eye." Michael removed the toy gun from his pocket and gave it to Officer Hunter. After about 5 seconds, Officer Hunter gave the toy gun back to Michael.

Officer Rowney told Michael to sit on the front porch, and Tanisha then came out onto the front porch and told Officer Hunter that her mother, Lisa Murray, was on the phone and wanted to speak to him. Officer Hunter stepped just inside the front door of the house and spoke to Lisa Murray for "a minute or two" about the events which had just occurred. Lisa Murray was upset that a gun had been pointed at her son and directed profanity at Officer Hunter as she complained about the incident.

_____

[3]In the Complaint, Tanisha Murrow is identified as Tinisha Murrow. However, other filings in this case repeatedly refer to her as Tanisha. In her deposition, she spelled her name "T-a-n-i-s-h-a" (Docket Entry No. 14, Ex. G, at 5). Accordingly, the Court will utilize "Tanisha" in the body of this opinion.

After Officer Hunter completed the phone call, Officer Rowney got in his car, and drove away. Officer Hunter went across the street to talk with Goldthreate and explained to her that Michael only had a toy gun in his possession.

Officer Hunter returned to his car and was still sitting in his vehicle when Lisa Murray returned home. Through the open window of Officer Hunter's patrol car, Lisa Murray again cursed at Hunter as she protested his actions with her son. She threatened to sue him and the police department, and demanded his name, badge number, and his sergeant's name and phone number. Officer Hunter gave her the information requested. Lisa Murray then went to the police precinct in an unsuccessful attempt to speak with Officer Hunter's sergeant. However, a few days later, Officer Hunter's sergeant called Lisa Murray and took her complaint over the phone.

During this incident on April 28, 2005, the officers never placed a gun against Michael's head or any other part of his body, nor did they threaten him, curse him, place him in handcuffs or tell him he was under arrest. Once the officers determined Michael had only been using a toy gun while playing with his sister, they told him he could get up off the ground, and he did so on his own, without the officers touching him. According to Michael, the officers never patted him down in order to feel for a gun. Neither officer threatened him, struck him, pushed him, grabbed at him or cursed at him.

Shortly after the incident, Michael complained that he felt dizzy, lightheaded, and his chest hurt, so his mother took him to Skyline Medical Center. The doctor at Skyline told Lisa Murray and Michael that he had an enlarged heart and he should not play sports.

Five days after the incident, on May 3, 2005, Michael was seen by Thomas P. Doyle, M.D., an Associate Professor of Pediatrics at the Pediatric Cardiology Clinic at Vanderbilt University. Dr. Doyle noted that Michael complained about first experiencing chest pain while he was playing basketball. Dr. Doyle was unsure of the etiology of Michael's pain but it was "non-cardiac in

4

nature." In his treating notes, Dr. Doyle did not even mention the incident with the police officers as possibly causing Michael's symptoms.[4]

Neither Michael, nor his sister, Tanisha, ever saw a psychologist, psychiatrist, or counselor as a result of the incident on April 28, 2005. Further, Lisa Murray was not injured as a result of the incident.

Based upon the foregoing events, Plaintiff Lisa Murray filed suit on behalf of herself and Michael and Tanisha in the Circuit Court for Davidson County, alleging Fourth Amendment violations under 42 U.S.C. § 1983, along with state law claims for outrageous conduct, assault and battery, the intentional infliction of emotional distress, and negligence.[5] Because of the federal claims, the case was removed to this Court. The pending Motions for Summary Judgment followed.

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the Court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be

---

[4]This is part of the statement of fact contained in paragraph number 24 of Defendants' Statement of Undisputed Material Facts to which Plaintiff provided no response (see footnote number 1). The statement further alleges that Dr. Doyle did not note the event with the police "most likely because neither Michael nor his mother mentioned to Dr. Doyle that they thought the incident with the police officers caused Michael's symptoms." Regardless of whether Plaintiffs agree with this statement, this allegation is not important to the Court's resolution of the pending Motions for Summary Judgment.

[5]The Complaint names as Defendants the Metropolitan Government, Officer Hunter and an "Unknown Officer." The "Unknown Officer" is presumably a reference to Officer Rowney. However, he was never named as a Defendant or served with the Complaint. Accordingly, only the liability of the Metropolitan Government and Officer Hunter is before the Court, although the same claims against Officer Rowney would be subject to dismissal for the same reasons that they are being dismissed as to Officer Hunter.

5

addressed is whether there exists any genuine issue of material fact that is disputed.  See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial.  If the party does not so respond, summary judgment will be entered if appropriate.  Fed. R. Civ. P. 56(e).  The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III.  APPLICATION OF LAW

## A.  FEDERAL CLAIMS

Plaintiffs bring federal claims under 42 U.S.C. § 1983, alleging unreasonable seizure and excessive force in violation of the Fourth Amendment.  They also seek to hold the Metropolitan Government liable for the actions of its officers.

### 1.  Unreasonable Seizure

Plaintiffs contend that Michael (and perhaps Tanisha) were subjected to an unreasonable seizure as a result of the officers' display of weapons.  Because they cannot show that the seizure was unreasonable within the meaning of the Fourth Amendment, Defendants are entitled to summary judgment on this claim.

The Sixth Circuit has recently reviewed the Fourth Amendment jurisprudence surrounding seizures as follows:

> The Fourth Amendment unquestionably prevents unreasonable seizures of persons. Where an "officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen . . . a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)[.] In effect,
>> a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure . . . would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.
>
> Mendenhall, 446 U.S. at 554, 100 S.Ct. 1870. Such seizures-known as Terry stops-do not violate the Fourth Amendment where the officer "possesses a reasonable and articulable suspicion that a person has been involved in criminal activity" and, in such situations, the officer can briefly detain the person "to investigate the suspicious circumstances." United States v. Heath, 259 F.3d 522, 528 (6th Cir. 2001)[.] A showing insufficient to constitute probable cause can nevertheless justify a Terry stop " *[b]ecause of* the limited nature of the intrusion." United States v. Brignoni-Ponce, 422 U.S. 873, 880, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (emphasis added).
>> Under Terry, courts examine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20[.] Courts evaluate the reasonableness of such seizures in light of the "balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." Brignoni-Ponce, 422 U.S. at 878, 95 S.Ct. 2574[.]
>
> Center for Bio-Ethical Reform, Inc. v. City of Springboro, 477 F.3d 807, 826 (6th Cir. 2007)(internal string citations omitted).

In this case, contrary to the Metropolitan Government's position, there can be little doubt but that Michael was seized, albeit momentarily. The facts viewed in Plaintiff's favor show that upon exiting the house, Michael, at the point of guns (including a shotgun), was ordered to place the bag of garbage on the deck, come down the stairs, and lie on the ground. Certainly, "a reasonable person would have believed that he was not free to leave" United States v. Mendenhall, 446 U.S. 544, 554 (1960) in these circumstances.

7

The fact that Michael was seized, however, does not end the inquiry "for what the Constitution forbids is not all searches and seizures but unreasonable searches and seizures." Elkins v. United States, 364 U.S. 206, 222 (1960); see, United States v. Maddox 388 F.3d 1356, 1361 (10th Cir. 2004)("The Fourth Amendment does not prohibit all searches and seizures; rather, only unreasonable searches and seizures are prohibited").  Indeed, Terry permits a limited investigatory stop based upon reasonable suspicion.

"Reasonable suspicion is, of course, a 'somewhat abstract' concept." Smoak v. Hall, 460 F.3d 768, 778 (6th Cir. 2006)(citation omitted). "It requires more than just a 'mere hunch,' but is satisfied by a likelihood of criminal activity less than probable cause, and 'falls considerably short of satisfying a preponderance of the evidence standard.'" Id. Hence, "[i]f an officer possesses 'a particularized and objective basis for suspecting the particular person . . . of criminal activity based on 'specific and articulable facts' he may conduct a Terry stop." Id. at 778-779.  Whether reasonable suspicion exists to conduct a Terry stop is determined from the totality of the circumstances.  Id. at 779.

In this case, the totality of the circumstances supports the propriety of the officers conducting a Terry stop. Officers had received a dispatch regarding a "person with a weapon call."  The description of the subject was a 16 or 17-year old black male wearing a gray top, white sweatshirt, and black pants.  Upon arrival at the scene, the caller confirmed to the officers that she had seen an 16 or 17-year old black male pointing a gun at his sister.  The caller's daughter stated that she too saw what she thought to be a gun.

With this information, it was reasonable to proceed to the suspect's house and walk up the driveway with guns drawn.  "This Circuit permits the use of force, such as handcuffs and guns, to effect a stop when such a show of force is reasonable under the circumstances of the stop." United States v. Heath, 259 F.3d 522, 530 (6th Cir.2001).   This is in keeping with the Supreme Court's

statement in <u>Terry</u> that police officers are not "required to take unnecessary risks in the performance of their duties." <u>Terry</u>, 392 U.S. at 23. "Indeed, police officers may use reasonable means to protect themselves when conducting a <u>Terry</u> stop, including drawing weapons if the officers believe the suspect may be armed." <u>United States v. Lindsey</u>, 114 Fed.Appx. 718, 721-722 (6th Cir. 2004) (citing, <u>United States v. Hardnett</u>, 804 F.2d 353, 357 (6th Cir.1986)).

Michael was on the ground only momentarily and then allowed to stand up on his own accord and walk to the front porch. He was never placed in handcuffs and upon showing the officers the toy gun in question, the investigative stop ended shortly thereafter. As a matter of law, this detention did not violate the Fourth Amendment and Defendants are entitled to summary judgment on Michael's claim of unlawful seizure. <u>See</u>, <u>United States v. Swift</u>, 220 F.3d 502, 509 (7th Cir. 2000)(under Fourth Amendment, "an officer may have his gun drawn and order a suspect to lie prone on the ground, handcuff, and frisk him if the officer reasonably believes the suspect is dangerous); <u>Crisp v. City of Kenton</u>, 1998 WL 180561 (6th Cir. 1998)(summary judgment appropriate in Section 1983 case where, responding to a call of a possible burglary of a pigeon coop, police officers, with guns drawn, ordered suspects to the ground and handcuffed them, even though all of the suspects were lawfully emptying pigeon coop) ; <u>United States v. McMurray</u>, 34 F.3d 1405, 1410-1411 (8th Cir. 1994)("officers conducting valid investigative detention may draw their weapons in situations involving potential danger to the officers").

The Defendants are also entitled to summary judgment on any claim by Tanisha that she was subjected to an unlawful seizure. All the evidence shows with regard to her is that after Michael was placed on the ground, she walked onto the back deck, a weapon was pointed at her, and she was told to go back into the house. Assuming that Tanisha was seized (i.e., because she was not free to leave the house), any such seizure was reasonable. At the time she exited the house, officers were dealing with a potentially armed suspect and it was reasonable for them to have their weapons drawn. It

9

was also reasonable for them to point their weapons at Tanisha and order her back into the house since they were in the midst of a potentially volatile situation. See, Reeves v. Alex Churchich, 2007 WL 1196502 (10th Cir. 2007)(summary judgment proper in Section 1983 action where, during course of dealing with possibly armed suspect at a duplex, other resident of duplex came out and a police officer pointed his rifle at the resident and ordered her back into the duplex).[6]

### 2. Excessive Force

In addition to claiming unreasonable seizure, Plaintiffs claim that Michael and Tanisha were subject to excessive force in violation of the Fourth Amendment. This claim is based upon the officers pointing their weapons at Michael and telling him to come down the steps and get on the ground, and pointing a weapon at Tanisha and telling her to go back into the house.

Standing alone, drawing a weapon on an individual does not necessarily mean that excessive force has been used and the question of the propriety of such force can be resolved on summary judgment. Anderson v. Antal, 1999 WL 717993 at **4-5 (6th Cir. 1999). Indeed, "[s]everal courts have determined that pointing a gun in the direction of a suspect or occupant is insufficient to sustain a claim of excessive force." Ratliff v. City of Three Rivers, 2007 WL 475191 at *10 (W.D. Mich. 2007)(collecting cases).

Regardless, "[a]s with the seizure inquiry, when assessing the reasonableness of the degree of force used by officers in effectuating a Terry stop, this court must consider the totality of the circumstances known to the officers prior to the use of force." Fisher v. Hardin, 398 F.3d 837, 854 (6th Cir. 2005). The reasonableness of a particular use of force "must be judged from the perspective

---

[6]Because this Court concludes that Plaintiffs cannot show that their constitutional rights were violated, Officer Hunter would be entitled to qualified immunity in any event. See, Charvat v. East Ohio Regional Wastewater Auth., 246 F.3d 606, 616 (6th Cir. 2001)(first prong of the qualified immunity analysis requires plaintiff to show the violation of a constitutionally protected right).

10

of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[.]"  Graham v. Connor,  490 U.S. 386, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation." Id.

At the time Michael exited the house, the officers were aware that an individual matching Michael's description had allegedly been pointing a gun at his sister.  When Tanisha exited the house, the officers were dealing with Michael and had yet to contain the situation or determine that what Michael possessed was in fact a toy gun.  For all the officers knew at the time their guns were drawn, they were dealing with an individual with a real weapon, and the officers did not know how the suspect would react upon encountering uniformed officers.  They also did not know how Tanisha fit into the dynamics of the situation.  Under these circumstances, the actions of the police officers do not constitute excessive force under the Fourth Amendment.  See, Reeves, 2007 WL 1196502 at *12 (where officers were trying to apprehend a potentially armed suspect at duplex, it was reasonable for them to have their weapons displayed and ready, and officers did not use excessive force by pointing gun at individual who exited from adjoining duplex and told her to go back inside); Johnson v. Deep East Texas Regional Narcotics Trafficking Task Force, 379 F.3d 293, 298 (Cir. 2004)(no excessive force used where narcotics agents wrongfully entered 67-year old's home with guns drawn during "round up" of drug suspects); Collins v. Nagle, 892 F.2d 489, 497 (6th Cir. 1989)(officers did not use excessive force by pointing gun at bystander who was approaching scene of arrest given police could not know bystander's intentions); Ingram v. Basile, 2006 WL 1431048 at *4 (N.D. Ill. 2006)("it can hardly be said that an officer approaching a suspected drug dealer with

11

his weapon drawn acts with excessive force" since drug dealers are often armed and this remained so even though officers slammed suspect into car in the process of arresting him). [7]

Given the facts which have been presented, Defendants are entitled to summary judgment on Plaintiffs' excessive force claim.

### 3. **Municipal Liability**

Because this Court concludes that no triable issue of fact exists on Plaintiff's federal claims with respect to the actions of the individual police officers, Plaintiffs' federal claims against the Metropolitan Government necessarily fail. Napier v. Madison County, 238 F.3d 739, 742 (6ᵗʰ Cir. 2001). Regardless, the Metropolitan Government is entitled to summary judgment because Plaintiffs have not shown a pattern, policy or custom by the Metropolitan Government to deprive individuals of their constitutional rights.

Section 1983 does not permit a plaintiff to sue a local government entity on the theory of *respondeat superior.* Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 692-94 (1978). Instead, "a municipality can be liable under § 1983 only where its policies are 'the moving force [behind] the constitutional violation.'" Canton v. Harris, 489 U.S. 378, 389 (1989)(citation omitted). Therefore, "a plaintiff who sues a municipality for a constitutional deprivation under § 1983 must

-------

[7]Plaintiffs' reliance on Humphry v. Mabry, 2007 WL 957354 at *6 (6ᵗʰ Cir. 2007) and Flores v. City of Palacios, 381 F.3d 391, 399 (5ᵗʰ Cir. 2007) is misplaced. In Humphry, the Sixth Circuit found that police officers were entitled to qualified immunity on a claim alleging excessive force under Section 1983, even though the record showed that the officers forcibly removed a driver from his vehicle at gunpoint, conducted a pat-down search, and handcuffed him based upon a caller's report of a man with a gun and a subsequent indication that the suspect was driving a similar vehicle. Humphry actually supports this Court's conclusion.
    In Flores, the district court properly found that a genuine issue of material fact existed on an excessive force claim where evidence showed an officer fired his weapon at the driver of a car who was allegedly parked on the wrong side of the street and did not heed the officer's command to stop. Flores involved the use of deadly force and the facts in this case obviously are markedly different.

prove that the municipality's policy or custom caused the alleged injury." Ellis *ex rel.* Pendergrass v. Cleveland Mun. School Dist., 455 F.3d 690, 699 (6th Cir. 2006).

In their Complaint, Plaintiffs allege that the Metropolitan Government "has a custom, practice or policy, executed by its police department, of unlawfully seizing citizens, at gun point, absent probable cause or other legal justification" and that Michael and Tanisha were deprived of their Fourth Amendment rights as a result of this custom, policy or practice. (Complaint ¶ 17). They also claim that the Metropolitan Government "has a custom, practice or policy, executed by its police department of using the lethal threat of lethal force inappropriately against citizens who are not engaged in criminal activity" and that "[t]his custom, practice or policy is a product both of the training and guidance given to various police officers, and the inadequacy of such training and guidance." (Id. ¶ 18).

In an effort to prove the existence of a policy or custom of the Metropolitan Government, Plaintiff points to a report from Sergeant Campbell Sowell ("Sgt. Sowell"), Officer Hunter's supervisor, in which Sgt. Sowell wrote:

> I don't believe the department has any reason to apologize on behalf of the officers involved . . . . I believe the officers acted within the boundaries of the law, and were justified in having their weapons out. The officers never used physical force or foul language in resolving this incident. It's readily apparent that Ms. Murray does not know the proper way to respond to an armed individual. The fact that her son was carrying a toy gun is not an assumption police officers can make. Police officers must assume the call is legitimate until discovered otherwise.

(Docket Entry No. 21 at 2). From this, Plaintiffs contend that Sergeant Sowell, in evaluating Officer Hunter's actions, "determined that Officer Hunter had acted within the bounds of police policy, in pointing a gun at an unarmed child without seeing the child threaten deadly force." (Id.). Plaintiffs also argue that because both officers involved in the incident filed reports in which they indicated

13

they believed they acted appropriately under the circumstances, this shows they acted" within the bounds of police policy." (Id.).

Defendants quite aptly describe the foregoing arguments as "specious." (Docket Entry No. 27). The fact that the officers involved and their supervisor believed the officers acted appropriately does nothing to show an unconstitutional custom, policy, or practice. For purposes of section 1983, custom and practice connote a policy and practice which is longstanding or deeply imbedded so as to "'avoid de facto *respondeat superior* liability expressly prohibited by <u>Monell</u>.'" <u>Cash v. Hamilton County</u>, 388 F.3d 539, 543 (6th Cir. 2004)(citation omitted). Further, the fact that the officers acted as they did in the situation presented does nothing to show improper training. <u>See</u>, <u>Miller v. Calhoun County</u>, 408 F.3d 803, 815 (6th Cir. 2004)("Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability."). Summary judgment will be granted on the municipal liability claim.

## B. STATE LAW CLAIMS

Having concluded that the Plaintiffs' federal claims should be dismissed, the Court "has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." <u>Musson Theatrical, Inc. v. Federal Express Corp.</u>, 89 F.3d 1244, 1254 (6th Cir. 1996). In deciding whether to exercise its supplemental jurisdiction, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." <u>Landefeld v. Marion Gen. Hosp., Inc</u>., 994 F.2d 1178, 1182 (6th Cir. 1993) . In this case, the balance tips decidedly in favor of addressing the state law claims since the parties have conducted discovery, the case is before the Court on Motions for Summary Judgment, and trial is scheduled for June 2007. It would not serve the interest of judicial economy to refuse to rule on the state law claims at this late date.

In their opposition papers, Plaintiffs do not even address the state law claims. Accordingly, "the court is under no duty 'to search the entire record to establish that it is bereft of a genuine issue of material fact.'" Spurlock v. Whitley, 2003 WL 223764617, *2 (6th Cir. 2003)(citation omitted).

### 1. Outrageous Conduct and Intentional Infliction of Emotional Distress

In Tennessee, "[o]utrageous conduct and intentional infliction of emotional distress are different names for the same cause of action" and hence "the two names are used interchangeably." Nairon v. Holland, 2007 WL 626953 at *4, n. 1 (Tenn. Ct. App. 2007). The tort of outrageous conduct in Tennessee exists only where (1) the conduct of the defendants has been so outrageous in character, and so extreme in degree, as to be beyond the pale of decency, and to be regarded as atrocious and utterly intolerable in a civilized society, and (2) the conduct results in serious mental injury. Swallows v. Western Elec. Co., 543 S.W.2d 581, 582-83 (Tenn. Ct. 1976). "Generally, 'the case involves facts which would arouse the resentment of an average member of the community and lead him to exclaim, "Outrageous!" Sayer v. Memphis Educ. Ass'n, 2006 WL 3298326 at *6 (Tenn. Ct. App. 2006) (quoting Chandler v. Prudential Ins. Co., 715 S.W.2d 615, 622 (Tenn. Ct. App. 1986)). Hence, it is not sufficient that a defendant "has acted with an intent which is tortious or even criminal, or that he had intended to inflict emotional distress." Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997).

Cases finding outrageous conduct include a mother being shown her deceased baby preserved in formaldehyde in a jar, Johnson v. Woman's Hospital, 527 S.W.2d 133 (Tenn. Ct. App. 1975), a mother being erroneously informed her daughter's death was the result of sexual assault and suffocation, Dunbar v. Strimas, 632 S.W.2d 558 (Tenn. Ct. App. 1981), and a photo store employee informing a woman that her film could not be developed when in fact the employee kept the nude

photographs and showed them to acquaintances of the customer, <u>Dunn v. MotoPhoto, Inc.</u>, 828 S.W.2d 747 (Tenn. Ct. App.1991).

Here, the facts agreed to by the parties do not rise to this level or constitute such extreme, outrageous conduct which would be beyond the pale of decency. Further, there has been no evidence presented that any of the Plaintiffs suffered serious mental injury as a result of the incident on April 28, 2005. Accordingly, the outrageous conduct/intentional infliction of emotional distress claims will be dismissed.

### 2. **Assault and Battery**

Under Tennessee law, officers are not prohibited from utilizing force against a suspect. Instead, an officer "may use the force reasonably necessary" to apprehend a suspect, "with due regard to other attendant circumstances, such as his own safety or that of others present." <u>City of Mason v. Banks</u>, 581 S.W.2d 621, 625 (Tenn. 1979). Tennessee courts may look to federal case law on excessive force in analyzing claims of assault and battery by police officers. <u>Baker v. Snyder</u>, 2006 WL 2654163 at *6 (E.D. Tenn. 2006).

In this case, the Court has already found that the officer's display of weapons was reasonable under the circumstances and did not amount to excessive force. The only claim of any physical touching is Michael's statement in his deposition that when he got down on the ground, one of the officers told him to place his hands over his head and "kind of put his foot on my back[.]" (Michael Morrow Depo. at 12). This is insufficient to create a triable jury issue. <u>See</u>, <u>Nolin v. Isbell</u>, 207 F.3d 1253, 1258 (11th Cir. 2000)(officer's use of force was *de minimis* and no triable issue existed where evidence showed that officer grabbed arrestee, shoved him a few feet against a vehicle, pushed his knee into the arrestee's back, pushed him against van and searched arrestee's groin area in an uncomfortable manner); <u>Long v. Pend Oreille County</u>, 2006 WL 2850011 at *10 (E.D. Wash.

16

2006)("alleged injuries reflecting only minimal force are insufficient to qualify as constitutionally excessive");  Bowles v. State, 37 F.Supp.2d 608, 612 (S.D.N.Y. 1999)(dismissal warranted where plaintiff alleged that he was pushed and shoved by officer during search incident to arrest).

### 3. Negligence

While Plaintiffs allege negligence in their Complaint, the Complaint speaks entirely in terms of intentional conduct on behalf of the Defendants.  In any event, Plaintiffs have failed to establish a breach of a duty, necessary elements of a negligence action.  West v. East Tennessee Pioneer Oil Co., 172 S.W.2d 545, 550 (Tenn. 2005).  Accordingly, summary judgment will be granted on this claim.

## IV.  CONCLUSION

For the foregoing reasons, the Motions for Summary Judgment filed by the Defendants (Docket Entry Nos. 14 & 18) will be granted.  This case will be dismissed with prejudice.

An appropriate order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

17